Argument not to exceed 25 minutes per side, with argument to be shared by appellants. Mr. Singal, you may proceed for the appellant. Good afternoon, Your Honors. May it please the Court, Kyle Singal for Appellant Rick Maike. I have reserved two minutes for rebuttal. Very well. This Court should reverse on Counts 1 through 10 and 13, and remand for entry of Judgment of Acquittal, because there is insufficient evidence of a pyramid scheme under gold. Alternatively, the Court should remand for retrial with legally correct instructions. Alternatively, again, the failure to give a limiting instruction on Anzalone's plea and the exclusion of Manning Warren as a pyramid scheme expert the night before trial require reversal. I invite the panel's inquiry. But otherwise, starting with the first issue, the crux of... You only have seven minutes, right? That's right. What do you want to concentrate on? We can't do all those. The crux of the argument on Issue 1 is that even if everything the government says is true, there's no pyramid scheme. The gold case itself is illustrative of what it means for a pyramid to be destined for collapse. Their people were buying gold under the expectation that they would pay off the balance of their purchase price with commissions earned from recruits. So they put $200 down. Does this argument hinge on whether the government's theory was limited to the emperors or covered everybody? The emperors are capped out at $5,000, but nobody else was.  So the instruction to the jury also limited the scheme to defraud to the emperors. So where I see the government arguing the pyramid was not just the emperors, they don't quite understand it because that ship seemed to sail when the government's request of instruction said the scheme was already a set of fraud. This is Instruction 8, Paragraph 1A, said it was selling emperor positions in I2G. Also, to the extent you're looking at the rest of the program, the bottom layer, the novices, so to speak, they weren't eligible for recruitment awards at all. I mean, as a matter of fact, the compensation paid to the emperors, and particularly the upper-tier people, what, like 98%, 99% drawn from recruitment fees, correct? Commissions, yes. I mean, people are making $15 a month as emperors from this casino stuff, and nobody gets a dime from the two other pieces of software, right? What makes a pyramid scheme per se illegal is when it's destined to collapse, and there is zero evidence that this was destined to collapse upon the emperor. Okay, but, I mean, wouldn't the jury – I mean, your brief is very well argued, very helpful, but my criticism would be it seems to view the evidence at trial in the light most favorable to Mikey. And, I mean, couldn't the jury find this destined to collapse because these three pieces of software were really – I mean, I'll tell you, I mean, the phrase that came to mind was mafia front business. You know, it's like, yeah, it's a business. Yeah, it's there. I mean, yeah, there's a little bit of revenue, but, like, revenue is not the purpose. But that only makes it a federal crime if there's a scheme of artificial defraud, and the pyramid scheme allegation is an end-run-around of what ordinarily requires the government to prove false material statements with an intent to further a scheme of artificial defraud. Yeah, I mean, yeah, I understand, and that's a fair argument, but it seems like the false material statements would be that these software products actually would generate meaningful revenue. It seems like perhaps – I mean, you read Anzalone's testimony. I mean, if you take it on its terms, it's like he didn't realize until kind of pretty well into this, maybe 2014 sometime. Actually, these products are – what we're telling people is not true. Let's go to issue two on the instructions. The government has – I mean, I'm not going to fight you on the viability of the products. I mean, I think at the very least the instructions were flawed because the instructions – I think you can view it as a Ruan issue, or you can view it as more simply a Rahafe issue. This is page 11-128 of the record during the charge conference that, quote, they do have to know that they joined something that met the definition of a pyramid scheme, and yet the district court's instruction didn't require any such knowledge. The government cites Stull on page 117 of their brief, and Stull says that knowingly participating in only as a surrogate for knowingly devising a pyramid scheme if, in fact, you had knowledge of the fraudulent elements of the crime. Let me ask you this. Let's say it's not a pyramid scheme. Let's say because it's limited to 5,000, let's say there's a saturation issue, whatever. Why is it not just a regular fraud then? The 5,000 emperor positions were just fraudulent. It's not a pyramid scheme. If you look in the indictment, the government flags on pages seven and eight of the second superseding indictment, there's this laundry list of overt acts, statements Mikey made, and in an ordinary indictment it would have the statement and say Mikey made the statement knowing it was false, but it doesn't. It just says the statement was false, right? And that's missing that allegation of willful intent that you would see in a schema-artificer fraud. But what about the evidence at trial and the jury instructions? I mean, this gets in, I guess, whether it's a variance or a constructive evidence, but your argument is the indictment charged only a pyramid scheme, right? Correct. The only theory of schema-artificer fraud is the indictment. It seems to me that the indictment mentions pyramid scheme a couple of times only as kind of set up and is, I think, broad enough perhaps to cover just a garden variety fraud, but I take it you disagree. Well, I mean, the government's theory of the case from beginning to end is and has been pyramid scheme. I think if the government honestly believed it could just say forget pyramid, we're going to go with any schema-artificer fraud, it would have done that more heavily in light of the saturation issues in the jury instructions, not complying with Rouen or Rahafe, and it hasn't really done that. Well, I mean, doesn't the indictment, and I guess we're talking about the mail fraud counts now. I mean, doesn't the indictment, I mean, yes, it references the pyramid scheme, but doesn't it reference just more generally, like fraudulent statements? It has the language of a statute that says the defendant's knowingly conspired to commit mail fraud, right? It has the generic language of a statute, but that alone doesn't state the elements of the crime, and the government, if you look at page seven or eight, it has this list of Mikey's statements, the casino's based on real profits, the profits were $27,000, which, as I said in the reply, that would equate to $5 per emperor. It's not exactly likely to indicate they want to pay $5,000. I mean, so you're saying that their presentation at trial departed from the, you know, basically from the indictment, and we're talking count one. In a way that prejudiced Mikey's ability to defend himself. Believe me, I mean, it's a serious, you know, variant or constructive amendments, amendments, they're serious business, but, I mean, but count one is what we would look to, right? And if count one is not, you know, count 13 hinged on count one, I don't think the government fights that, and the government affirmatively agreed that counts two through ten hinge on count one as well. So count one is... Count one, but it's also incorporating all this stuff. There is no mail fraud count, right? There's just mail fraud conspiracy. You know, I mean, you cite the testimony of the ten people who said they were just interested in the casino revenue, and, you know, that's what they said, but, and I'll just tell you kind of my reaction to it and let you speak to it. I mean, that just tells me that there was evidence of security fraud, that these people thought that they could buy into a revenue stream, and that the representations that led to that belief, the jury could find to be... The sound bites on securities fraud, there was ample sound bites of, you know, you don't have to do anything to make money, not fighting that, but the securities fraud count required the schema artifice to defraud from count one to be found in order for the securities fraud count to be upheld. So what this all comes down to is was there a schema artifice to defraud for count one, and the government has to prove some of it, any sufficient evidence under Jackson versus Virginia, either to prove that there was a pyramid scheme under gold, which I think we're stuck with, even though I'm not sure that Congress has ever delegated to the FTC the task of defining the contours of... We don't necessarily. We don't have to get it, right? But the government has to have some evidence, so the government says, well, it doesn't turn on the ten witnesses' subjective motivations, but there has to be some evidence that this was going to collapse, and in any of the, you look at unattrition, burn lounge, gold, it's impossible for the company to proceed in perpetuity because there will be a saturation of... Why wouldn't the material misrepresentations be able to solve that problem, too, on the securities fraud? Because the way the indictment was set up and the way the jury charges set up required the count one schema artifice to defraud to exist in order for count 13 to go forward. This is on pages 39, 40, and 44 of my brief that count 13 hinged on count one. I don't think the government's thought that. Just one, well, I forget what my question was. I mean, the government has to prove either that there was enough evidence under gold for it to be a pyramid, the way that gold sets forth, or if you don't believe there was a constructive amendment or a variance, evidence. And we have not raised a sufficiency challenge to, or at least Mikey hasn't, for the reasons you cited. I'm trying to be candid with that. I appreciate your candor. This whole business about the 5,000 emperor cap, I mean, that just seems to me to accelerate. If, in fact, the emperors themselves are only getting compensation from recruiting more emperors, it just seems to accelerate the collapse of the whole thing. If they're in it for commissions, sure. But, I mean, ultimately, if they're just buying $5,000 shares from Mikey, then the commission just reduces Mikey's income. He's not getting $5,000 per share. He's getting $5,000 minus commission paid per share. But, ultimately, whether it's $5 or $5,000 doesn't change the end result. It's just the amount of money the emperor's paid for their share. Okay, all right. Back for rebuttal? Yes. Thank you. We'll hear from Mr. Meyer. Thank you, Your Honors. I'm Kenny Meyer, Maine Police and Court, and I represent Joyce Barnes and Faraday Hosinapur, and I have also reserved two minutes for rebuttal. To address some of the questions that have been asked by the court, first the question about whether or not the scheme to defraud involved the entire company or just the emperor program. As counsel indicated, the jury instruction says, the first element that the defendant knowingly participated in or devised a scheme to defraud in order to deprive another of money or property, comma, that is through the sale of emperor positions in I2G, and that was because that's what the indictment said. I actually had, with all due respect to counsel and the fees, I have the opposite position. I tried the case, and our position was that the indictment was a conventional fraud indictment, and it did not charge a pyramid scheme. The only mention of the pyramid scheme in the entire indictment is in paragraphs one and two, and the indictment says that the emperor program says, quote, the defendants engaged in a $25 million fraudulent pyramid scheme operating under the name of I2G, quote, by representing that investors would receive a return on investment based upon an online Internet gaming site called I2G Casino. That's not a pyramid scheme. As a matter of law, that may be something. It may be fraud. It's not a pyramid scheme. Can you tell me what page ID you just read from? What page? Yes, it's page one, paragraph one of the second superseding indictment. Okay, so if it's a conventional fraud indictment, why wasn't there sufficient evidence of that? Well, and again, my clients are in a significant different position of Mr. Mikey, and I'm happy to talk about why we think there's insufficient evidence with respect to Joyce Barnes and Mr. Centiport, who is the distributor. But we don't know why the jury convicted. The jury could have convicted under these instructions solely on the pyramid scheme theory, and that's why I fought so hard on it. Could the jury have convicted solely on a, hey, you just sold a bum steer knowingly? They could have, but because we don't know and because there's error in the instructions on the pyramid scheme and because, as a matter of law, it's just not a pyramid scheme, there's got to be a reversal. If there's sufficient evidence on the straight line Well, if the jury could convict on any theory, don't we uphold the conviction? Not when we don't know why the jury convicted. If the jury was instructed that a pyramid scheme is a scheme to defraud. But there's also a separate definition of scheme to defraud. Any plan, etc., etc., right? So that's fairly broad. That's your standard mail fraud instruction, right? Correct, but the jury was instructed that they could convict without finding that Joyce Barnes or Faraday or Centiport thought there was any false statement made or whether they knew there was any false statement made. I mean, the jury in both counts 1 and 13 was told, if you find there's a pyramid scheme, there is a scheme to defraud, and that's enough. So I think that, and my co-counsel probably will be able to cite cases better than I will, but the law of the Sixth Circuit, I believe, is that if the jury could have convicted because of the erroneous instruction, then it's reversal. If there's sufficient evidence on the misrepresentation, we get a new trial. We would submit there's insufficient evidence that either Joyce Barnes or Faraday or Centiport knew anybody lied to an emperor, which is the relevant issue. Sorry. And that, I think, maybe, well, I don't mean to cut off your line. So, I mean, why don't you try to make the argument, whatever. I mean, why don't you speak to that, the sufficiency of the evidence. I mean, Barnes is head of sales. He's at a lot of these things. Right. Or is Anzalone's partner. I mean, Anzalone just walks through chapter and verse, the particulars of what was happening and eventually how it became apparent it's fraudulent. And why doesn't that apply to Barnes, for example? Well, with respect to Anzalone, I read it differently. And I know that we've talked about his plea, and that's significant. And the government wanted to advocate the position that if it's a pyramid scheme and you join it, you're guilty. Because it's inherently fraudulent. Because it's inherently fraudulent. We thought, no, there's got to be specific intent. So my position, I thought naively that Anzalone was going to tell the truth and do the right thing. And to a large extent, he did. I mean, he says, I got in, I'm an MLM guy, seemed like a good plan to me. Dois, I thought, did the right thing. I've worked with Faraday. She's an honest person. We listened to Mikey. We relied on Mikey. A lot of faith in Mikey. Correct. He had lawyers. They had lawyers telling us it was the right thing. I asked him, did you think your wife was lying? Never. She never lied to anybody. Did she know anybody was lying? No. Did Faraday lie to him? No. And what he ultimately said was the products had some problems, but they actually ultimately fixed the products, and things were going well. We had a new touch. Where do you get they ultimately fixed the products? I mean, Songstagram was a disaster. Songstagram was a disaster. So was the touch thing, which apparently was a dupe of something you could get for free. Well, the proof of that, and by the way, that was introduced through hearsay through a video. But Anzalone, we got zero from both of those. Zero. Anzalone testified that the products- It was zero for both of those products, correct? I know it was for Songstagram. I'm pretty sure it was for touch. The touch, the model in this, again, was a defect in the instructions and, frankly, the experts' testimony. The theory of this company was that this product, which the undisputed proof was $800,000 was put into the touch, was improved, added features, and it was sold to distributors. I mean, that was the distribution model for the touch. We're going to make this innovative product available, you know, Zoom before Zoom, Facebook Live before Facebook Live. This is 2013, and we're going to cause people to want to keep paying for this. And the testimony was that it had problems, but Anzalone said it worked. Anzalone said his wife trained people on it. I remember that. And then Anzalone also said once the Rocky Wright gentleman had issues, they paid money, the company, not Rick and Mikey, paid money to get it reprogrammed and it was rebranded as G1 eTouch, and it was a fantastic product. That was what Anzalone said in his testimony, and it is- How about that Ricardo email? Are you familiar with that one that gets read during Anzalone's testimony? It's just a bill of indictment against the whole thing that just seemed to be a fairly devastating summary of what had become apparent by that point in this whole scheme. And, like, I mean, if you-I'm not trying to give you a pop quiz, but, you know, he talks about how all the revenue is going to pay top-tier people, that these are junk products that are getting a very small percent of this revenue, that, you know, the Touch thing is available elsewhere. Nothing works. People are getting $15 a month from the casino. I mean, I just-I read that and I was like, so what part does the defense say a rational jury could not agree to? Well, I think two things. Number one is it's not-it wasn't probative of a pyramid scheme. It's probative of somebody saying we don't like your products, there's a problem. I think-I guess the governance theory as I understand it is that Mikey, for starters, and then eventually all the defendants in front of us, everyone realized that what the people were being told for purposes of recruitment was false, that this stuff was-there was no way that the casino is going to pay off your $5,000 investment if you're a passive person, that a jury could conclude, you know, the check flashing where they don't even actually get the money. Hacinopore doesn't get it. Anzalone doesn't get it. But people are being led to believe that actually they're paying out $156,000 checks, etc., etc. And so we have to look at this in the light most favorable to the jury's verdict. Why couldn't the jury conclude that at some point for each of these people, at some point they knew that what these people were being told at conferences and the check flashing and the casino as a passive investment, Barnes said, you know, you don't have to do a thing. At some point, these people knew they were lying to these Denver people. Well, I would challenge the notion. First of all, Faraday Hacinopore, who comes in, wants the companies in existence. She's a distributor like everybody else. She, number one, doesn't-and again, this is the problem with the instructions. She and, frankly, Dois, who's an MLM, would have no idea, there's no way to know from, in this case, the jury instruction of the prior standard that this company is a, quote, pyramid scheme. I mean, there's nothing in their head that would lead them to believe this is anything other than an ordinary MLM. What point in time are you talking about? There's never a time, probably until the government, that they would know that this is- Were you getting e-mails complaining about the company? I thought there was an e-mail that said, hey, this is a pyramid scheme. There was one e-mail in the record where one person said it's a pyramid scheme, but a pyramid scheme-it's not a pyramid scheme. I mean, a pyramid scheme is a company that is doomed to fail because it is dependent on endless recruitment. And if the products are junk and at some point the defendants realize that, then it is doomed to fail because the- And in fact, I mean, all the money they're getting, everybody, every defendant, every emperor, 99% of the money they get is from recruitment, not from the casino, right? No. Fifteen bucks a month, as opposed to 900 grand that Anzalone and Hacinafor get. I mean, and 15 bucks a month. I bet you it's more than 99% is recruitment. So how would they not know? Or a jury could certainly conclude that they knew this is a pyramid scheme. Well, I think a jury could not know. Well, first, I'd like to push back on one thing. Sure. That's what I meant by that. The issue of internal consumption. So the plan was that these innovative products-I don't think anybody would suggest that Rick Mikey planned to have bad products, right? I mean, they paid a lot of money. He wanted these-believed these products were valuable. The plan is that you're going to increase demand for these products and people are going to pay for them. Those people were distributors for the touch. Another aspect of the plan was we're going to pay you to direct traffic to the casino. You're going to get commissions for every player in the casino. We're going to continue to bring innovative products. You're going to make money, retail sales by selling. We're going to bring in fantasy sports. You're going to make money. That was the plan. Now, your point is that at some point, things start going poorly. Does that render it a pyramid scheme? I would say no. It may render it a bad company. It may render it-if you lie about it, it may cause you to be fraudulent. But because the products start not performing, it doesn't turn it into a- They never perform. I don't think that's the evidence. I think the evidence is that the touch performed. The touch had glitches. In a revenue sense. The whole theory of the case was that-the whole theory of the company was that when you're selling an importer package, the products do drive those sales. So when you're paying $5,000, you're paying for a combination of things. You're paying for the right to continue to receive these products. You're paying for the interest in the casino. These were the representations. This was the proof of the government was that everybody who bought it- and what's interesting is when these people come in and say, here's why we bought these packages. We bought it for reasons that were true. They were told, you will get a share of the casino profits. That's why they bought it. That was true. Now, the casino didn't work out too well. Sure, they were entitled to a share, but I think the government- a jury could find that the representations were false or misleading to the sense that this would be enough to recoup one's investment. There's no proof that anybody ever said that. The proof was that the representations were, if you buy an importer position, here's what you get. They got exactly what they were told. They all came in and testified, this is why we bought it. The emperor was set up so that most of the money that you were going to get was through recruitment, wasn't it? Only if you- There were several ways. The recruitment went all the way down the chain. You got credit for somebody way down the chain bringing somebody new on. It was an elaborate system where the money came in from recruitment all the way up and down the chain. All of which is common in MLMs. The reason the problem in this case was- Of course, you weren't going to tell somebody this is a pyramid scheme. You were going to tell them, hey, you're going to sell these products. Of course, right? Right, but the difference in the expert, which we didn't have an opportunity to rebut, but their expert incorrectly told the jury that recruitment does not include- Another distributor. He said to them, if it is a member of ITG and they buy something, they buy these products, that doesn't count. That is recruitment. This internal consumption issue. That is wrong as a matter of law. The FCC said it's wrong. Kentucky statute at the time said it's wrong. I think I'm out of time. Let me ask you a question in a slightly different way. I understand from the beginning that it's not the defendant's burden to prove that they're not guilty. I'm not suggesting that in my question. I tend to agree with you in a general sense that just because the sale of these products didn't work out for any number of reasons, the fact that the venture failed does not then establish it's a pyramid scheme. I want you to just park those off to the side. Was there anything in this record introduced by anybody that indicates that what the intended revenue was from these various products was really what was driving this company as opposed to what turned out in reality to be that the vast majority of the revenues came in through the sale of these distributorships? I think the fundamental evidence was that in this particular company, the goal was number one, we're going to have a successful casino. Rick Mikey thought online gambling is big, we can generate people, we can use this system to drive traffic to the casino, and it's going to be huge. So that was number one. Was there a projection of how much they could make from the casino? Not that it was ever introduced in the record. Second, the theory was that there wasn't a difference. There was a difference between, as Gold said, the ultimate user and the participant. And that is where the instructions didn't, we asked for an instruction on that, the government suggested an instruction on that, the court would not instruct on it, and the expert said you cannot, if you are selling a package to a person, that is recruitment, and that's what we're hearing from you all for good reason. That's in the court's mind, and in the jury's mind, and frankly in your all's mind, if you sell a $5,000 package to a distributor to come in, that is automatically recruitment. That's not what the law has been in the past. I don't think anybody said that. Mr. Keefe said that. What we're trying to... Yeah, I'm not answering your question. The answer to your question is no, I don't believe there was a... What we're trying to tease out here is that they sold these things for $5,000, and there didn't seem to be any realistic prospect that anybody was going to get their investment back, other than by the sale of down-level distributorships. This venture just doesn't seem, on the face of what we've seen, to suggest that it was a legitimate company based upon the sale of the products. The sale of the products seemed to be an afterthought, really, that attempted to cover up the fact it was a pyramid scheme. So I think the thought was $5,000, you get something of value for the $5,000. You get the products, and we're going to pay money to innovate them, we're going to continue to bring in new products, and we're going to allow you to make money from the products. But you would agree that if the products really had no value, you can't count that. Correct, and the jury was never asked it. I mean, I think that should have been the instruction, right? The instruction should have been, you can't just pretend that a distributor isn't an ultimate user, but is the product incidental? Is the product a scam? The jury was never asked to look at that. If you pay $5,000 and you get a piece of software that is worth $5,000, and in addition to that you get the opportunity to sell additional products, you get the right to get future products, you get the right to make commission from sending people to a casino, it's not doomed to fail. It's certainly not doomed to fail because it's dependent on recruitment. It may be doomed to fail because the products don't work out. But that's really the fundamental issue and the problem with it. I started to say this about Anzalone, but the problem with that plea and the problem with the use of that plea was the intent. Because what they said to him was, you know, you didn't know, and he said, I didn't know it was a fraud, I didn't know it was a pyramid scheme. They said, did you go to college? No. You're a plumber, right? You didn't know you were doing anything wrong. And then did you have a lawyer? Oh, I have a great lawyer, Pat. Pat's a great lawyer. He explained it all to me, and after he explained it to me, I realized I'm guilty and I pled guilty. And that's basically the last thing they say in closing. That was a use, and I fought as hard as I could to keep that out. I fought as hard as I could. He said he would give an instruction, and he just never did. It was clearly a mistake. And they used it. It wasn't just the absence of, which I do think is reversible, But it is the fact that they used that, his guilty plea, to show why Ms. Hosenapore, who's his partner, who didn't know, who had no clue that this was illegal, why she's guilty. Hosenapore did not object to this, if I recall. Only Barnes did. Well, Hosenapore had a lawyer. They refused to object, and they wanted to go after him on cross. I would like to address that. You're saying this because you copped the plea. I think that the reply that Mikey Fogg articulated, but first of all, she had the opposite. She had a negative lawyer. I mean, if you look at this record, she would have been much better off with zero lawyer. I mean, he told her she would be committing a felony if she pled, and I objected to it. I totally get what you're talking about. But the preservation issue, I incorrectly advocated that the police shouldn't come in at all, because they're not going to impeach him. I don't think we're going to have to impeach him, so it shouldn't come in at all. And then the counsel for Mikey said, eh, we're going to impeach him. So I think it's appropriate for the government to preview the credibility issue. And then that's when Hosenapore's lawyer agreed with Saul, but they never backed away from the fact you should only use it for credibility and that you should get a limiting instruction. So I don't think that can be read. We've gone way over time. You'll have your rebuttal, but I think we need to hear from the government. Good afternoon, and may it please the Court. Tyler Lee for the United States. I'd like to start by addressing the question that Judge Nalbandian raised about whether this hinges on whether the scheme was emperors or everyone in I2G. And this case does not hinge on that. We think that the conspiracy theory is that the government is trying to make it look like has always encompassed all of I2G. As charged in the indictment, the conspiracy is flawed. What about paragraph 1A of instruction 8? So it's correct that the first element of the mail fraud instruction does refer to the sale of emperor positions in I2G. But again, this is a conspiracy case, so there's not a substantive mail fraud charge here. And the conspiracy instruction just states that the government must prove that the defendant knew the conspiracy's main purpose, i.e., to commit fraud. So even if the object offense of the conspiracy, this mail fraud scheme, could be read as limited to the emperors, the conspiracy still includes all of I2G because they set up this entire program in furtherance of the fraud conspiracy. You can't divorce the emperors from the rest of I2G. Why would that instruction even be in there? I'm confused. I don't know why that instruction was ultimately in there. Do you agree it was an error? The government's position, again, throughout trial, was consistently that the scheme referred to the I2G program as a whole. What about the remark that saturation wasn't an issue in the case? Well, I don't think that saturation was an issue in the case, Your Honor. But don't you need an unlimited possibility of recruitment? I mean, it can't be limited at $5,000 to be a pyramid scheme under Costco, right? So, Kanyar, and that goes to this question of this idea of whether a pyramid scheme has to be destined to collapse. You know, a pyramid scheme is inherently fraudulent because it will eventually collapse. But the government does not have to prove as an element of that definition, of the pyramid scheme definition, that it was going to collapse or that it was doomed to fail. Isn't that what Costco says? No, Costco just explains that a pyramid scheme is structured where you pay money into this program to receive two things, the right to sell a product and the right to receive recruitment rewards unrelated to product sales. Do you have a case that says that a limited number like the Emperor's at $5,000 can be a pyramid scheme? No, Your Honor, but there's also no case at all discussing the possibility that a $5,000 or any other numerical cap can be an effective anti-saturation policy at all. If anything, it just... Wait, the cases seem to say that a pyramid scheme involves this unlimited idea that it would eventually collapse because you would run out of people in the universe to sell to. That, to me, suggests that it has to be unlimited. And I'm asking you, is there a case that says, hey, you can only sell 5,000 of these, but it's still a pyramid scheme? Do we have a case like that or would we be the first court that would say, yeah, you can have a limited pyramid scheme? To my knowledge, Your Honor, there's not a case that says that. So we would be the first? I believe you would be the first, but I think the district court correctly recognized here that when you have a 5,000-member cap, the scheme is just going to collapse on the last of those 5,000 people. The cap only operates to limit the number of victims. Okay, but why is that not just a regular fraud? I understand, okay, maybe that's problematic because these 5,000 people didn't have anything to sell but recruitment or when they bought these things. But I don't understand how that's a pyramid scheme. It might be a fraud. It's not a pyramid scheme, as I understand the FTC and others have defined it. Well, I also think that the cap doesn't operate as an effective anti-pyramiding policy here because the emperors were not limited to recruiting only other emperors. They could continue to recruit other people at different levels, and then you would run into, again, this problem of endless recruitment. Even though the emperor spots were filled up, those emperors could still continue recruiting down line theoretically infinitely. So saturation was something that was going to happen. I mean, it was going to be unlimited. Potentially. Then why did they make the remark that said saturation is not an issue? I'm completely confused. It's not an issue in that the government doesn't have to affirmatively prove that it has happened. The government doesn't have to offer this sort of affirmative proof of it because as the court observed in Gold, the government shouldn't have to wait for a pyramid scheme to collapse before taking some action because of the risks that it poses to investors. I mean, why isn't the answer to this whole saturation, the 5K thing, 5,000 limit, that it's just an artificial saturation point. It's actually a saturation point. You can't get any new members. It's a smaller pyramid, but it still completely collapses. Maybe the people up top are doing well because they got a million dollars or whatever it might have been, but that bottom layer, if the products aren't actually generating revenue and it's just recruitment, it collapses at 5,000 rather than at 6,000 or 7,000. I think that's right, Your Honor. I think, as you said earlier, it accelerates the collapse. But again, that theory, which sounds great, that's not what the pyramid scheme cases say, right? I mean, that may be a fraud, and I'm not saying it's not a fraud, but it's not really a pyramid scheme in the way that we classically understand a pyramid scheme. The novel pyramid scheme. Whatever. The way that courts have conceptualized a pyramid scheme is one in which the scheme focuses on recruitment over product sales because at some point you're going to run out of people to recruit. Now, whether that happens through – Okay, look, in my reading of the cases, the idea that it's destined to fail is part and parcel of a pyramid scheme, that, yes, it's a problem where it's unrelated. You have to have that. But this idea that it's unlimited recruitment is also part of these pyramid scheme cases. Now, I'm not saying that you're doing something right, that it isn't a fraud, but I'm not sure that it meets the classic definition of what a pyramid scheme is. That's all I'm saying. And you've suggested to me that, well, there aren't really any other cases that say that this limited pyramid scheme is a thing. I mean, that's what I heard because I don't see any cases on it, and you haven't cited any. There are no cases that I'm aware of, but there's always going to be, I think, some sort of cap that you could come up with that, again, wouldn't operate to limit it. You could say that – That says, no, there is no cap. You're going to run out of people to sell to in the world. In theory, that's the problem. That's what makes it a pyramid scheme, right? Well, I think what most cases have really focused on is whether the incentive is tied to recruitment or whether the incentive is tied to sales. Again, the government doesn't have the burden to affirmatively prove that eventual fact of saturation or collapse. But isn't that a fraud? If I'm telling you, hey, sign up and you're going to sell all these products and this is how you're going to make money, but I know that's not true. In fact, the only way you're going to make money is to recruit other people. I think certainly – That's just a fraud, isn't it? That could also just be a regular fraud, yes. Right, that's exactly this case. We think that – we charged this case, the indictment alleged both a pyramid scheme or a scheme to defraud as otherwise alleged, as was suggested earlier. And it's this court's rule in La Pointe, which is cited in Supplemental Brief 15, that the jury can convict on any theory that's contained in the indictment. So the jury could have convicted in this case based on the finding that it was an ordinary scheme to defraud, if you will. What's – do you mind – can we talk about instructions a little bit? Go ahead. So what's – I mean, what's the deal – what's going on with all these instructions, you know, where – and apparently the government both want some more specific – sorry, it's been a long day – specific reference to intent regarding fraud, but we don't get that. And it's sort of, well, if you were in a pyramid scheme, that's going to just cover all the elements of fraud. I mean, do you – I mean, are the – do you think these instructions were fine, or are they harmless in your view or something? We think these instructions were fine, Your Honor, and let me – Correct. Yes, let me parse out the sort of elements of fraud here. So the jury was instructed on the first element, the scheme to defraud. They were instructed on the definition of a scheme to defraud and that a pyramid scheme constitutes a scheme to defraud. Inherently. As a matter of law, and that's this Court's decision. So it's like a meta element. If you find this, you're done. No, only – Is that okay is maybe the question on the table here. Yes, Your Honor. I mean, that's – and again, that's only as to the first element. And so the jury was not instructed that there was a scheme to defraud in this case. They still had to find that the scheme here met the definition of a pyramid scheme as instructed. And then the jury was also not instructed that they could convict without finding a false statement. You know, the element – the second element of the mail fraud offense was – is that the scheme included a material misrepresentation or concealment of a material fact. So the jury still had to find that there was a material misrepresentation as part of this mail fraud scheme or this mail fraud scheme conspiracy. And then the jury was also instructed, third, that they were required to find that the defendant had the intent to defraud. Sure. So, I mean, basically what you're saying here is that Gold tells us that an illegal pyramid scheme constitutes a scheme to defraud. And if you stop right there, there might be a mensory problem. But separately, the instructions did say, as I understand it, that the jury had to conclude separately that they had an intent to defraud. That's correct, Your Honor. Now, is there any dispute about whether the instructions say that or whether they say that in the right place? There's no dispute about that. And you can take a look at those instructions. It's record docket number 554 at page ID 5265, the mail fraud – the elements of mail fraud. So it's, what, conjunctive? They have to find – Let me ask you the question this way because I don't have the instructions in front of me. Is – can the jury – could the jury just find for these instructions that, yes, this was a pyramid scheme and then we're done, proceed to check the box guilty? Or did they – did the instructions direct the jury, even in the event they say it's a pyramid scheme, you must also find that they had intent to defraud, there's false representation, et cetera? So the way the instruction lays it out, it specifically explains that the term mail fraud has four elements and it breaks out those four elements entirely separately – the scheme to defraud, the material misrepresentation, the intent to defraud, and the use of the mail. And it's not in this instruction that the jury was instructed in a separate instruction that it had to find each element of every offense beyond a reasonable doubt. Okay, but – so the answer to my question is no as to fraud, that – well, I forget the way I phrased it, but then they would not need to make the separate, more specific findings as to each element of fraud if they found that the defendants participated in the pyramid scheme. It sounds like you're telling me. I mean, no, I don't think – The pyramid scheme only gets the first element, doesn't it? Correct, yes. Or artifice to defraud. Yes. By the way, that first element instruction is the one that limits it to emperor positions, right? Yes, it does. So that's a pretty important instruction. That's the element instruction. But then the court goes on, Your Honor, as Judge Halmanian said, to give definitions of some of these terms, and it limits the pyramid scheme to the scheme to defraud element. It says a scheme to defraud is this, a pyramid scheme is a scheme to defraud. But it doesn't – that doesn't, you know, absolve the jury of having to find these other elements that are listed, the material misrepresentation, the intent to defraud, and the use of the mail. We're still talking about mail fraud, right? Conspiracy to commit mail fraud. We're talking about the substantive elements of mail fraud. So here the instruction said that the jury had to find they voluntarily joined the conspiracy. Yes. Didn't seem to be any dispute about that. But they also had to prove that they knew the conspiracy's main purpose, i.e., to commit mail fraud. That's correct, Your Honor. So that's where you're hanging your hat. The instructions were sufficient as to mens rea, even though they defined an illegal pyramid scheme as a scheme to defraud. I mean, the conspiracy instruction didn't say they had to know the main purpose, i.e., a scheme to defraud. The main purpose was to commit fraud, and so then the jury was properly instructed on all of the elements of what that fraud offense was. I want to address one thing that was raised by my friend on the other side about the I2G Touch. This product, we think it was probative of a pyramid scheme because it is cosmetic. I think it was disguising this focus on recruitment, and it was, again, this sort of incidental product. And I want to push back on this idea that these were products that these defendants really believed in. They were just waiting for them to succeed. I think the evidence to the contrary shows that from the start, this scheme was conceived as being based on recruitment. And I would point the Court to the revenue projections, the evidence that was introduced at trial, the emails between Mikey and Barnes, where from the start, the revenue projections for I2G were based entirely on recruitment, entirely on the sale of these membership packages. So how could it be a securities fraud then? There wasn't going to be any passive income, right? It's not a security. How can it be a pyramid scheme based on recruitment only and also securities fraud then? Those two things can coexist, particularly here, Your Honor, where the securities fraud was sort of part of the misrepresentations that were inducing people to buy into what was actually a pyramid scheme. But what was the security? So the security was this share in the casino profits. The emperor positions? The emperor positions, the shares. This passive share of the casino profits that it was completely illusory, I thought. I thought the whole thing was active participation by the emperors to recruit, and that's not a security. Well, I think, again, those two things can coexist. The casino profit share was touted or marketed as this passive income. In other words, it was marketed as a security. Don't we look at the reality of what it was to figure out what a security is? It's not just what was touted, isn't it? Well, it's whether it was, yes, whether the object had these characteristics of a security, the four elements of Howie. And I don't think, you know, they did buy this share in the casino profits. It's just that it wasn't profitable. You know, it didn't end up succeeding. But they still received. More than that. So there wasn't a misrepresentation. They were buying casino profits. Look, this casino, who knows? Maybe it could have taken off. Maybe they could have gotten a deal with MGM. Maybe blah, blah, blah. Who knows? Any other Internet company. It's like Amazon. It took 10 years to make money. So this casino is, you know, aspirational but not completely fraudulent. I mean, I just don't understand how your theory of the pyramid scheme and the theory of the security go together. It looks like you get one or the other. So I want to make clear that when the emperors bought these casino profits or bought these casino profits share, they were buying them based on misrepresentations, as is key to the securities fraud. It was about the profits. Right, because Mikey lied about these profits on the conference call. There was evidence. Would it be another way to say that essentially one of the means of the mail fraud slash pyramid scheme included the sale of what turned out to be securities? I think that's fair to say, Your Honor. The casino profit share was the sort of securities fraud that induced people to buy into this scheme and then left them stuck with the reality, which was that this entire scheme was incentivized by recruitment and recruitment was the only way to make money, and that's the pyramid scheme aspect of it. So I was wondering a little bit about gold, too, if I might. I think there's a lot of confusion, at least in my mind, about the question of tying recruitment bonuses to the sale of new memberships as opposed to being tied to a profit. Excuse me, tied to a product. That seems to me what gold is talking about, and that's certainly how you distinguish a multilevel distributorship or why you distinguish what Amway does, for example, from the sale of whatever these things were. Gold seems to be talking about is there any tie between the sale of the memberships that you're selling and products, and here it's an illusory tie. That's basically your position, right? That's correct, Your Honor. Now, where it gets confusing, I think, is does the government also have to prove that the reason this is a bad thing, it seems to me it's already inherently a bad thing, but do you have to go on and prove it's a bad thing because eventually it'll collapse of its own weight? That's the anti-saturation. I don't think we have to. Well, I think the Ninth Circuit sort of refined this in the Byrne Lounge decision by explaining that that second cost cut factor is met when the scheme focuses on recruitment over sales because when a scheme focuses on recruitment over sales, it's going to lead to that problem of running out of people, of the endless recruitment. But really, as I understand this, the burden then becomes on the defendant to prove they had adequate anti-saturation policies, right? The defendant can disprove that second prong of cost cut by showing that they adequately tied these things, yes. And the argument, the issue here is whether capping it at $5,000 was sufficient for that purposes. Yes. The defendants argued that this was an anti-pyramiding policy, but it's the government's position that that $5,000 member cap did not operate as an effective anti-pyramiding policy, and no court has, again, as I've said, has ever found that such a cap like that can constitute such a policy. You know, the approved policies that can make your multilevel marketing company legitimate are the ones that you've referenced, like the ones that are set up in Amway, for example, where... Where they distribute ships to products. Right, where, for example, distributors have to make a certain number of retail sales before they can receive any commission bonus for the month, things like that. But none of that was done or, you know, offered here by the defendants. I'd like to ask you a couple questions about Barnes. You know, see, he's the only one who objects to the reference to Anzalone's conviction when Anzalone testifies. He's got a clean objection to that. And meanwhile, I mean, he does seem to be one of the least mentioned defendants in some of this testimony, certainly Anzalone's, I would say, about the scheme. And so if... And it seemed, I mean, you would agree it was a mistake by the district court not to give the instruction, right? Correct, Your Honor. Okay, so now, you know, we have to... If this is not a constitutional violation, which probably it isn't, then we have to do a certain harmlessness analysis. And so for that purpose, can you... I mean, Barnes shows up on stage a couple times. He had a certain title, et cetera. But what's your best evidence, your best pieces of evidence that Barnes was, you know, like, knew the scheme's purpose, that he knew that this was a pyramid scheme, that these products, you know, the promises were false, that they were lying to emperor recruits and so on? What's your best evidence on that? The evidence that I would point to here, Your Honor, is the fact that, you know, Barnes was this owner. He was the VP of Marketing involved in the development of this structure and this whole company from the beginning. And again, going back to these revenue projections that were sent with the revenue projected from recruitment. So from the beginning, he was involved in these projections that were coming entirely... Did he have a role in preparing the projections? Yes, I'd have to look at who exactly sent the email, but it's emails between Mikey and Barnes on this topic. I can track that down. Yes, and then as Your Honor mentioned, he was present at these marketing events, these conference calls where these misrepresentations were made. Such as? Which ones would you flag for this purpose? So, for instance, Songstagram, Barnes presented. He gave a presentation at the event where Songstagram was introduced and that's at Government Appendix, pages 235 and 236. This is where they start saying this about, you know, Prince and everybody is going to be tweeting about this product? Yes, the representations, but also the fact that Mikey introduced Rocky Wright as Bob Johnson at this event to conceal the bankruptcy. And so Barnes, who had been involved in the Songstagram deal, didn't do anything to correct that misrepresentation or anything like that. And he was present at the time the guy gets introduced as Bob Johnson? I believe so, Your Honor. I mean, he was certainly present at the event. He gave a segment of the presentation at that event. And again, I think going back to Barnes' role overall, you know, I think given his role in the company, the jury could reasonably conclude that he knew things like the fact that Mikey didn't actually purchase the I2G Touch with the billionaires from China and so forth. You know, I'd also point to Barnes' promotion of the casino profit share as passive income, saying on a call, for example, that people could just sit back and draw money from the pool. Can you tell me when that call was? I don't, I'm not sure I have the exact date of that, Your Honor. I apologize. Well, we can track that down. If it's at the very outset, it could comport with the idea that, you know, people thought this was going to work and, you know. I believe it was October 2013. So it was, say, in the middle of this scheme because, you know, Mikey was already promoting this scheme back in August 2013 on a call as getting paid dividends and buying stock. So then you have several months later, Barnes making this representation about the passive income. A separate issue is the district court's denial of Hacinopore's motion for an evidentiary hearing as to her ineffective assistance of counsel claim, right? That's correct, Your Honor. And, I mean, she presents affidavits that lay out significant evidence of ineffective assistance of counsel. Why wasn't it an abuse of discretion for the district court to deny that motion? Or is that something you want to, you know, are you even really disputing that? No, I think as this court has recognized in Allen and in Bass, these cases that are cited in our briefs, the district court has the discretion to deny an evidentiary hearing before ruling on a motion for a new trial. And I think here the district court was within its discretion to determine that this record could be more appropriately developed on a motion under Section 2255 as is the usual practice of this court. Does it matter that in this case, at least what the district court recited as the basis for the exercise of his discretion that he seems to have made a couple of errors? I don't think so, Your Honor. I think that goes to the merits issue of her claim and not to the hearing issue. I mean, the denial of the hearing was premised on the fact that she should develop this record through a 2255. You know, then turning to the merits, we do agree that the court, you know, didn't conduct this colloquy that it states, or there's nothing in the record indicating that this colloquy was conducted, but we think that's more of an issue for the merits of her claim. But, I mean, if the person's claim ultimately is as a result of an ineffective assistance claim, I guess, is I should not be sent to prison. And that person comes forward with significant evidence. And frankly, if you read the transcript, you know, it shouldn't be a surprise to anybody that there might have been, that there's a serious ineffectiveness issue there. So, in light of that record, you know, in this case, and then, you know, the knowledge that she is going to go to prison and maybe she shouldn't, isn't that an abuse of discretion, particularly when it's for a reason that's wrong? I mean, really? I mean, we're going to say that that's not an abuse of discretion on that record, all that combination of things? Well, I think on the record that we have here, you know, the district court didn't rely only on its mis-memory of that supposed colloquy. It relied on the government's memorandum, which did establish that she discussed the potential of a plea with government counsel, and this was laid out in a nearly four-hour meeting. Do you agree, or does the record show whether she would have gotten the same plea deal as Anzalone had her lawyer, or at least that that was offered to her lawyer? No, it does not. You know, she makes that allegation, but there's nothing in the memorandum of that particular meeting that the government submitted. That's something one could find out at an evidentiary hearing, right? Potentially, yes, Your Honor. Well, if the government is sticking by its guns, you can do that. But I guess I'll just stop on that one. Well, isn't another way to look at this, and I'm not taking sides in your discussion here one way or the other, but this district judge presided over this trial for 25 days. He sat there while this attorney performed adequately or inadequately, as the case may be. So while we may be looking at it now in hindsight to say this guy was awful and nobody can dispute that, the district judge was there, and apparently he didn't think so. That's true, Your Honor, and the district court did specifically say that, you know, that about Ms. Sassanian-Ford's counsel. The district court said, I quote, there is nothing that I saw that he did that impaired the representation of Ms. Sassanian-Ford's case. And as the district court acknowledged, and I think... They didn't even know about the plea negotiations or what was offered in the plea. In fact, they didn't even know whether there was a fine hearing or not. That's correct, Your Honor. That's a big issue. But the district court never knows that. That's what comes out when it's more fully developed in a collateral proceeding. So my only concern, I don't have a stake in this one or the other, but my concern is how much are we opening the door here in future cases by saying you file a motion for a new trial and you claim ineffective assistance of counsel and you attach it with some affidavits? I mean, I think the district court can properly reject that kind of claim when it determines that these affidavits are self-serving and can deny the motion in that new trial posture and allow the defendant to bring that on in 2255. I think even if this court were inclined to remand here for an evidentiary hearing, which, again, we don't think is the appropriate, we think that the best way forward would be to allow her to bring that claim on 2255. She's been released from prison. That's correct. She has been released. So how does that work? Does she just stay out? Well, I mean... I'm not sure, Your Honor. I would think that once the appeal proceedings have concluded that there would be no more basis for her release pending the appeal and so she would be remanded. But I think in this case in particular, it might be inefficient to remand for an evidentiary hearing because of the consolidation posture and the numerous other issues that she and the other defendants have raised. So if this court does want to send it back for an evidentiary hearing in this posture, we would just ask that it render a decision in all other respects as to not delay the resolution of the remaining claims. Well, I mean, there are a lot of issues in this case, and there wasn't a lot of a filter on the front end, I will say, in the blue briefs, it appears, in terms of what to argue. But those aren't your briefs. All right. Well, thank you very much for your arguments and for you, among others, for, you know, kind of complying with our request to try to get this done here today. We'll hear rebuttal. Thank you, Your Honor. I'll try to be quick. Judge Nalbandian, if a jury is instructed on two theories and one of them is improper, this court's precedent requires reversal. The case is U.S. v. Palazzolo, not the takings case. It's on page 7 of my reply. The government is correct that it's improper to charge a jury with alternative theories, but if one of those theories is wrong, that requires reversal. Judge Kethledge, page 8 of my reply details why Mikey did, in fact, object to the failure to give a limiting instruction. That happened on day 1. Well, I saw it. You know, he objects to the reference in the opening, but that's it. Well, on day 1, everyone's in agreement that the court has to give a limiting instruction, and the court agrees to that. And then on day 4, before Anzalone testifies, Mr. Myers says, well, I think that maybe we won't need to impeach him at all, and Saul says, I disagree to that, but that's all Saul disagreed to. He didn't undo the previously preserved objection. Yeah. No, I agree. But that's the right... I mean, so the objection to the reference in the opening is preserved, but he expressly chose not to object to the reference... Didn't withdraw the requirement of a limiting instruction, and subsequently the government agrees in their briefing there subsequently was a request for the limiting instruction that was never given. That's the error. So the opening is 1, the limiting instruction is 2. To what effect do we give, if any? And I'm thinking about this back from my experience with having been a district judge. To what extent does a lawyer have an obligation to remind a judge on a timely basis to do what he said he was going to do, and he failed to do it, as opposed to just sitting back, being silent, and then arguing as you are today, saying we made that objection earlier, we didn't withdraw it, so we preserved it. The policy we threw out was an objection by one, it was an objection by all. Yes, on day 4, Saul did not join in Kenyon-Myers, when I say additional objection, but later on the government acknowledges, and I cited the pages in my reply brief, there were several additional requests for the limiting instruction. There was one in writing, there was a written motion I think on July 19th after Anthony testified, and then on either day 21 or day 23 during a charge conference they talked about the limiting instruction, and the judges never gave it. So your answer to my question is that you did remind them. We did, we did remind them. And if I may, one more quickly, sorry. Talk fast, so we'll let you do that. Thank you. Hopefully you can hear me, or at least understand me. Judge Kessler, you had a great question about the conjunctive elements, and so if you look at the mail fraud instruction, there are page ID 5265. The real problem here, as I think everyone knows, pyramid scheme is a surrogate for scheme to defraud. That's not just a surrogate for element 1A. It's a surrogate for elements 1A, B, and C, because once you've proved scheme to defraud, if you read the definition of scheme to defraud in 2A, that includes false representations and intent to defraud. So as long as, and the government said on page 1009 on day 21, all they have to do is prove a pyramid scheme. They don't have to prove a particular lie. I thought that was 10,012, but anyway, that's a stupid joke. I'm impressed. I applaud your command of the record. It's very genuinely helpful. Thank you. You're saying that would go to elements 1, 2, and 3? It would go to elements, yeah. As it's in the instruction, it's 1A, B, and C, but as it's in any other list of four, it would be 1, 2, and 3. So pyramids are surrogates for everything except use of the mails, which obviously... And it's the emperor pyramid. It's the emperor pyramid. All right. Thank you. I hear from Mr. Meyer. I do think that the uniqueness of this pyramid does implicate Prococo, the Prococo argument that we raised, which is that the vagueness elements apply to instructions, especially in light of the addition. We've talked about this burn lounge case. Burn lounge was decided after I2G started. It's a civil case from the 9th Circuit reviewing an FTC decision, and that was added. We clearly objected to that. I objected to that, and I think the instruction is just vague. How so? Because the instruction says first sentence is gold, and then it says information from... doesn't include anything about the internal consumption issue. And then the language from Prococo is something to the effect of, if the structure suggests X, Y, and Z, that is a pyramid scheme. And I think a reasonable person in an MLM is going to have no idea what that means. They're not going to know whether or not, which is the court said in gold, which side of an unclear line. I thought it said something like, if most or the revenue, compensation or whatever the term would be, is principally based on recruitment rather than selling. It doesn't say print. It says the structure of a pyramid scheme suggests that the focus is on promoting the sale of interest in the venture rather than the sale of products, where participants earn the right to profits by recruiting other participants who themselves are interested in recruitment fees rather than products. A pyramid scheme constitutes a scheme or artifice to the fraud. Why is that not just fleshing out the preceding part of the instructions that came from gold? Because in every single MLM there is recruitment. Every single MLM there is recruitment. What gold said is that while from a plain air perspective this instruction was fine, in the future we think you should draw more clear distinctions between an ordinary MLM and an illegal pyramid. And then the court suggests all of these potential state laws. That, frankly, the implement, I'm not going to say gold violates Prococo in and of itself, but the implementation in this case, when you're trying to implement that, and say, you know what? What's illegal and what's not illegal? We've got to change this instruction. This isn't made by a legislature. This is made by unelected regulators and prosecutors. But to answer your question, it is a vague, the structure of a pyramid scheme suggests. The argument was if it's a structure, it's a pyramid. The structure suggests that you recruit, and this, we would suggest, would render every MLM illegal. I don't want to not mention the false evidence. I mean, we've talked a lot, but the evidence 7240, which we confirmed in the restitution proceedings, indicated that $29 million in commissions that were earned by people were left out of the 101I. That's where that 96% came from. It was created by the government days before trial, and their witness confirmed in an affidavit that it's just false. This whole notion that 96% of people lost money was false. It was repeated throughout trials, repeated in the closing, and I don't want my failure to mention that in my brief time. Thank you for your time. What would you say is your best case to show that this is not an illegal pyramid scheme? Because while there didn't seem to be much of a tie between the sale of products and the earning money through recruitment bonuses, there were some products involved here, and there was a cap. What's the best case that you would analogize this case to? The IMPRA program was going to succeed or fail on, if the casino, the product... I'm asking you for a case. Oh, I'm sorry, a case. The best case that says why this wasn't a pyramid, I would say just the cases that define pyramid as dependent on it, endless recruitment, and dooming it to fail. All right. Thank you for your argument. Thank all of you for your argument. The case has been submitted. The court may adjourn for now.